## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMANADA LYNN LIVELSBERGER,** | : | **Civil No.  3:25-CV-00528** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Judge Munley)** |
| | : | |
| **FRANK BISIGNANO,** | : | **(Magistrate Judge Carlson)** |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

This is Amanda Livelsberger's third attempt at securing Social Security disability benefits. In this latest application Livelsberger alleges that she has been disabled since 2007 due to the combined effects of a series of emotional and physical impairments including, bipolar disorder, anxiety, agoraphobia, PTSD, degenerative disc disease, osteoarthritis of the bilateral knees, and chronic obstructive pulmonary disease (COPD).

However, as detailed by the Administrative Law Judge (ALJ) who heard this case, with respect to her physical condition, Livelsberger's clinical history was often marked by relatively conservative treatment and reports of improved health.

1

Further, every medical source who examined Livelsberger or considered her clinical history opined that she retained the ability to perform some work.

Similarly, Livelsberger's mental health treatment records were somewhat sporadic and highly expedient in that she explained to her caregivers "that the main reason she's attending therapy is to obtain social security and elaborated on the belief that persons approved for disability are those that complain to their doctors/attend therapy which she typically wouldn't do." (Tr. 1323). Given this checkered clinical history, with one exception, the medical experts who evaluated her case agreed that Livelsberger's emotional impairments resulted in only mild impairments and were not severe.

On these facts, the ALJ concluded that Livelsberger retained the residual functional capacity to perform some work and denied her latest claim for benefits. Livelsberger now appeals this adverse decision launching a multi-faceted attack upon this agency ruling. In evaluating Livelsberger's appeal, we are reminded that the Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the

2

agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g.</u>, <u>Perales</u>, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S. Ct. 206. See <u>Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

In this case, after a dispassionate review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek</u>, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we recommend that the district court affirm the decision of the Commissioner denying this claim.

## II.   <u>Statement of Facts and of the Case</u>

### A. <u>Introduction</u>

The administrative record of Livelsberger's latest disability application reveals the following essential facts: This is at least Livelsberger's third unsuccessful

Social Security disability application.[1] Livelsberger submitted her latest disability application on November 27, 2021, filing a Title II application for a period of disability and disability insurance benefits. On January 27, 2021, Livelsberger also protectively filed a Title XVI application for supplemental security income. In both applications, Livelsberger alleged disability beginning June 2, 2007, due to an array of emotional and physical impairments including bipolar disorder, anxiety, agoraphobia, PTSD, degenerative disc disease, osteoarthritis of the bilateral knees, and chronic obstructive pulmonary disease (COPD). (Tr. 17, 19-21). The plaintiff later amended her date of onset to October 2019. (Tr. 24).

Livelsberger was born on October 29, 1975, and was 43 years old on the alleged disability onset date, which is considered a younger individual under Social Security regulations. (Tr. 32). She has a high school education and had previous work experience as a hotel clerk and telemarketer. (Id.)

### B. **Livelsberger's Physical Impairments**

With respect to her physical impairments, the ALJ aptly summarized Livelsberger's clinical records in the following terms:

> The medical record prior to the amended alleged onset date of October
> 1, 2019 reflects a history of chronic pain (with diagnoses including

---

[1] While Livelsberger has told treating staff  that she "has been denied 4 times," (Tr. 1323), Social Security records revealed two prior unsuccessful applications in 2006 and 2010. (Tr. 95).

osteoarthritis), as well as other impairments that are not severe during the period at issue (such as mental health conditions and substance use). Ex. 1F; 2F; 15F/17-22. In October 2019, around the amended alleged onset date, the claimant was seen for consultative physical and psychological evaluations. Ex. 3F; 4F. She was found capable by the evaluating physician of performing a range of medium work despite her physical impairments (including asthma and chronic low back pain and disc replacements L5-S1; she had undergone disc replacement L5-S1 in 2007, Ex. 3F/4). Ex. 3F/9-14. She was found by the evaluating psychologist (who diagnosed mental impairments including unspecified anxiety disorder; unspecified depressive disorder, as a provisional diagnosis; post-traumatic stress disorder; and cocaine and heroin use disorders, in sustained remission, Ex. 4F/4-5) to have at most mild mental limitations. Ex. 4F/10-12.

Subsequently, the medical record is primarily significant for treatment and follow-up of chronic pain complaints, especially complaints of back pain radiating into the lower extremities and knee pain. The claimant has had significant issues with her lumbar spine and has undergone surgery (in October 2023). However, the medical evidence before and after surgery does not support the claimant's lack of capacity for a range of light work. While the claimant alleges disability beginning in October 2019, her documented treatment for the allegedly disabling pain symptoms was fairly limited from 2019 until 2022. In April 2022, a lumbar MRI did demonstrate severe stenosis at L4-L5 with bilateral foraminal stenosis. Ex. 11F/165, 170; 13F/3. In August 2022, a CT myelogram of the lumbar spine demonstrated post-surgical changes from decompression and interbody fusion L5-S1 (the spinal canal appeared decompressed at that level); adjacent segment disease at L4-L5 with moderate to severe spinal canal stenosis; and additional degenerative changes. Ex. 19F/16-17. By October 2022, the claimant was felt to be a surgical candidate, though she wished to hold off and continue with conservative management until February 2023, when she indicated that she was open to discussing surgery. Ex. 5F/77; 13F/3; 21F/1; 26F/39.

Despite the claimant's symptoms, physical exams in 2022 and in 2023 prior to her lumbar surgery showed her to present in no apparent

5

distress, with an occasionally antalgic gait but ambulating independently (most exams showed unremarkable gait) with only slightly limited range of motion (or relatively good range of motion of the spine); lower extremity strength in the 4/5 to 5/5 range (most exams showed 5/5 lower extremity strength); and normal bulk, tone, and sensation in the bilateral lower extremities. See, e.g., Ex. 5F/77; 11F/20-21, 124, 169; 12F/63-64, 74; 13F/2-3, 9-10; 21F/1; 24F/1; 26F/11-12; 27F/3; 29F/41. Moreover, prior to surgery in October 2023, the claimant received epidural steroid injections (as well as ischial bursa injections in September 2022) and had her medical marijuana card renewed (Ex. 10F/7; 11F/32-33, 98, 141-43; 12F/11-12), subsequently reporting improvement in her symptoms. Ex. 11F/16-17, 119, 133, 138; 12F/57; 13F/2-3; 26F/4. She also reported improvement in her pain with medications and changing positions. Ex. 13F/2, 9.

Although surgery was initially scheduled sometime in 2023, the claimant canceled after reporting that her pain was getting better with conservative management. Ex. 27F/23; 28F/1. However, in October 2023, she reported that the pain had gotten worse and that she could not walk more than 20 yards. At that point, she wished to reschedule lumbar spine surgery. Ex. 27F/23. Later that month, on October 30, 2023, the claimant underwent L4-L5 laminectomy and foraminectomies. Ex. 28F/5-8. A little over a month later, on December 4, 2023, she reported doing relatively well. She reported that her bilateral leg radiculopathy had completely resolved that she had had significant improvement in her neck pain. She continued to endorse back pain in the right paraspinal muscles but described this pain as intermittent and dull, usually occurring with activity. She reported 80% improvement in her preoperative symptoms and stated that she was very pleased with the results of her surgery. Ex. 28F/11-12. She was cleared to bend and twist at that time, with a 25-pound weight restriction. Ex. 28F/12.

In the most recent medical evidence, in February 2024, the claimant was seen at an office visit to establish with a new primary care provider. She again reported improvement in her back pain. She reported that she had a different pain that seemed to go down her legs, as well a bilateral

6

knee pain. Nonetheless, a physical exam showed her appearance to be normal, with normal range of motion and no neurological deficits. Ex. 31F/5-6.

As for the claimant's knee impairments, imaging studies have shown some evidence of osteoarthritis and other abnormalities. An MRI of the left knee in November 2022 demonstrated complex degenerative undersurface tear involving the posterior horn/posterior root attachment of the lateral meniscus; and grade 3/4 chondromalacia along with lateral tibial plateau and medial patellar facet. Ex. 19F/11. An MRI of the right knee in December 2022 demonstrated abnormalities including 4.1 cm multiocular leaking popliteal cyst; patellofemoral and lateral compartment osteoarthritis; and intact cruciates and menisci with intrasubstance degeneration. Ex. 19F/5. But, as noted above, despite her knee pain, the claimant's gait has only occasionally been antalgic on examination, and has otherwise been unremarkable/intact (moreover, even when an abnormal gait has been noted, no use of an assistive device has been noted). See, e.g., Ex. 5F/77; 11F/20-21, 124, 169; 12F/63-64, 74; 13F/2-3, 9-10; 21F/1; 24F/1; 26F/11-12; 27F/3; 29F/41.

In December 2022, the claimant's clinical symptoms and exam were noted to be consistent with mild osteoarthritis of the bilateral knees with Baker's cyst right greater than left, and she was recommended continued nonsurgical management. Ex. 29F/17. In October 2023, she was felt to be a candidate for left knee surgery (arthroscopy with partial lateral meniscectomy), but she indicated that she would first be proceeding with back surgery. Ex. 29F/42. A physical exam showed her to have antalgic gait, but no use of an assistive device was noted, and her stance was normal. She appeared to be well coordinated. She had full range of motion and 5/5 lower extremity strength. She had positive medial/lateral joint line tenderness and positive patellar compression and apprehension tests, but otherwise all tests were negative/normal. Ex. 29F/41. At a lumbar spine postoperative follow-up visit in December 2023, the claimant continued to endorse bilateral knee pain, but denied any numbness, tingling, or weakness and reported that she was not taking any pain medications. A physical exam showed bilateral upper and lower extremity tone, bulk, strength, and sensation to be normal. Ex. 28F/12. During the period at issue, the claimant has

7

had conservative treatment for knee symptoms, including injections, aspiration of her Baker's cyst, and physical therapy (Ex. 6F/8, 12; 12F/77, 88-89; 24F/12; 26F/24-25, 40-41; 29F/8-12, 25), and has reported at least some relief. Ex. 12F/81, 92; 24F/1, 4; 29F/22, 25, 27, 37.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

As for COPD, the record contains limited mention of the claimant's COPD/respiratory symptoms and reflects no significant treatment during the period at issue other than prescription of albuterol and occasionally prednisone (for acute symptoms of sinus pressure, cough, congestion, etc.). Ex. 7F/22, 27-28, 37, 55. This condition has been found severe because pulmonary function tests during a consultative physical evaluation did show some restriction (the claimant's FEV1 was 79% of predicted). Ex. 8F/7. However, given the lack of significant treatment for COPD exacerbations, this impairment is not found to preclude the claimant's ability to sustain light-level work so long as her exposure to environmental factors is limited. Notably, the claimant has smoked despite her COPD, which is why, while her exposure to environmental factors is limited, it cannot be entirely precluded. Ex. 7F/22.

(Tr. 24-27).

## C. **Livelsberger's Emotional Impairments**

Between December of 2022 and May of 2023 Livelsberger received treatment for her alleged emotional impairments through Wellspan Philhaven. (Tr. 1316-1360). These treatment records indicate that Livelsberger's mental health treatment was largely opportunistic and was designed to improve her prospects for obtaining disability benefits. Indeed, Livelsberger candidly told her caregivers that her motive in seeking care was to bolster her disability application, stating that she:

8

> [H]as been pursuing social security and notes that she is in the appeal stage and hoping for a decision within 60 days. [Livelsberger] has been denied 4 times and is hopeful that she will be approved this time noting she has hired an attorney to assist her. *[Livelsberger] noted that the main reason she's attending therapy is to obtain social security and elaborated on the belief that persons approved for disability are those that complain to their doctors/attend therapy which she typically wouldn't do.*

(Tr. 1323) (emphasis added).

These limited treatment records indicated that Livelsberger was diagnosed as experiencing bipolar disorder, PTSD, agoraphobia, and anxiety. (Tr. 1346). It was also noted that Livelsberger had engaged in a long-term struggle with substance abuse issues. (Tr. 1336). During her three months of treatment, Livelsberger was consistently described as engaged and cooperative; she was alert and calm; her affect was normal in range, intensity and mood congruent; her thought process and content were normal, pertinent and goal-directed; she displayed a sustained ability to resist distraction and maintain focus; she was fully oriented and her short- and long-term memory was intact. (Tr. 1321, 1327-28, 1334). Clinical notes further revealed that Livelsberger had average intellectual functioning along with good insight and judgment. (Id.)

By April 2023 Livelsberger was discharged from treatment for attendance noncompliance. (Tr. 1319).

**D. Medical Opinion Evidence**

While her treating caregivers did not provide any opinions in support of this disability application, other medical sources opined regarding whether Livelsberger was disabled by her impairments. Given the relatively unremarkable nature of her clinical history there was a broad medical consensus among these consulting and examining sources that Livelsberger retained the ability to work. In fact, nine of eleven medical sources agreed that she could perform light work without significant mental limitations.

### 1. Opinions Regarding the Plaintiff's Physical Condition

With respect to Livelsberger's physical impairments, in December of 2019, a state agency expert, Dr. Hong Park, concluded that the plaintiff was capable of performing work at a medium exertional level. (Tr. 100-104). A consultative examination conducted by Daniel Chege, NP, in October of 2019 reached similar conclusions. This report revealed that Livelsberger "brought no assistive device to the exam," (tr. 433), and found that she did not need a cane to ambulate. (Tr. 438). NP Chege also concluded that Livelsberger was able to meet the physical demands of light work. (Tr. 431-442).

Later, in July of 2022, another state agency expert, Dr. Kevin Hollick, opined that Livelsberger could perform light work with some postural limitations. (Tr. 108-

10

115). In March of 2023, a third state agency expert, Dr. Michael Lombard, reached similar conclusions, finding that Livelsberger was capable of performing a range of light work. (Tr. 119-128). These opinions, in turn, were consistent with a December 2023, treating source opinion by PA-C Sheena Corl. At that time PA-C Corl issued post-operative guidance to Livelsberger which was consistent with the ability to perform light work, stating that the plaintiff had "a 25 pound weight restriction until the 12-week mark from surgery." (Tr. 1516).

Thus, there was a broad medical consensus spanning some four years that Livelsberger could perform a range of light work. The only outlier opinion came from a consulting, examining source, Dr. Ahmed Kneifati, in July of 2022.  (Tr. 681-697). Dr. Kneifati found that Livelsberger was limited to sedentary work, but notably also concluded that she did not require a cane to ambulate. (Tr. 693).

### 2.  Opinions Concerning the Plaintiff's Mental Limitations

The medical sources who considered Livelsberger's emotional state likewise generally agreed that she only faced non-severe, mild impairments. This view was first expressed in November of 2019 by a state agency expert. Dr. Thomas Fink, who concluded that the plaintiff's emotional impairments were mild and non-severe. (Tr. 99). In July of 2022, a second state agency expert, Dr. John Gavazzi reached similar conclusions, finding that Livelsberger had no limitations in terms of understanding,

11

remembering and applying information or adapting to the workplace, and was only mildly impaired when it came to interacting with others and concentrating. (Tr. 111).

Both of these state agency expert opinions were consistent with the judgment of the sole medical source who examined the plaintiff, Dr. John Kajic. (Tr. 447-458). In October of 2019, Dr. Kajic found that Livelsberger had no limitations in terms of carrying out simple instructions and only mild limitations in other spheres of workplace functioning. (Id.) Dr. Kajic's findings were consistent with those of a second consulting, examining source, Dr. Kathleen Ledermann. In July of 2022, Dr. Ledermann issued a report which found that Livelsberger was generally unlimited in terms of her ability to carry out many workplace functions and experienced only mild limitations interacting with others. (Tr. 706-713).

The only outlier opinion came from a non-examining state agency source, Dr. Paul Taren, who concluded in January of 2023 that the plaintiff was mildly impaired in terms of understanding and applying information, but experienced moderate impairments interacting with others, concentrating, and adapting to workplace changes. (Tr. 123).

### E. **ALJ Hearing and Decision**

It was against this medical backdrop that a disability hearing was conducted in Livelsberger's case on April 5, 2024, at which the plaintiff and a vocational expert

testified. (Tr. 42-81). Following the hearing, on May 31, 2024, the ALJ issued a decision denying Livelsberger's application for benefits. (Tr. 17-34). In that decision, the ALJ first concluded that Livelsberger met the insured status requirements of the Social Security Act through June 30, 2024, and had not engaged in substantial gainful activity since October 1, 2019, the amended alleged onset date. (Tr. 20). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Livelsberger had the following severe impairments: degenerative disc disease; osteoarthritis of the bilateral knees; chronic obstructive pulmonary disease (COPD). (Id.) After a careful analysis and focusing on both the clinical record as well as the medical opinions consensus, the ALJ found that Livelsberger's emotional impairments resulted in only mild limitations and therefore were not severe. (Tr. 21-22). As the ALJ explained:

> The claimant's medically determinable mental impairments (bipolar disorder, anxiety, agoraphobia, PTSD, Ex. 20F/2; 23F/3, 17), considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere. The claimant has had some limited mental health treatment, but treatment notes do not indicate more than minimal functional limitations for 12 continuous months. She was seen at WellSpan Health for an initial psychiatric evaluation in September 2022 for symptoms of depression and anxiety. A mental status exam was largely within normal limits. Ex. 17F/19. She was diagnosed with bipolar affective disorder, PTSD, and anxiety. Ex. 17F/17-21. In November 2022, she was seen for an initial therapy assessment. Ex. 17F/2-7. A mental status exam was again essentially within normal limits. Ex. 17F/4. She was recommended medication

management and therapy. Ex. 17F/8. During a mental health visit in February 2023, she shared that the main reason she was attending therapy was to obtain Social Security disability. She reported that she had been accepted as a volunteer to Kentucky Play Think, which would allow her to attend festivals free of charge. She reported that she was hoping to earn money and sell her art as a vendor. Ex. 23F/8. By April 2023, she was discharged from outpatient therapy at WellSpan due to noncompliance with attendance.

(Tr. 21)

At Step 3, the ALJ determined that none of these conditions met any of the Commissioner's listing criteria. (Tr. 22-23). Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered Livelsberger's impairments as reflected in the medical record, and found that:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following exceptions: She can never crawl; climb ladders, ropes, or scaffolds; or be exposed to workplace hazards such as unprotected heights or open moving machinery. She can occasionally climb ramps/stairs, balance, stoop, kneel, or crouch. She can never reach overhead or operate foot controls. She can have no concentrated exposure to extreme cold/heat, wetness, humidity, vibration, or irritants (e.g., fumes, odors, dusts, gases). She should be afforded the option to change positions for 1-2 minutes after any continuous 30-minute period of sitting, standing, or walking.

(Tr. 23).

Specifically, in making the RFC determination, the ALJ considered the medical evidence and the plaintiff's testimony regarding her impairments. The ALJ

14

first engaged in a two-step process to evaluate Livelsberger's alleged symptoms and found that, although the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 24). On this score, the ALJ's decision rested upon the equivocal and often unremarkable clinical record. (Tr. 24-27). The ALJ also examined Livelsberger's activities of daily living and found that:

> The claimant's activities of daily living during the period at issue also support her capacity for a range of light work. Notably, her function reports are somewhat inconsistent in reporting her daily activities. For example, in one report, she states that she spends a typical day in bed until noon, then spends much of the remainder of the day switching positions from her chair to her bed. She states that some days she does not even get out of bed. Ex. 14E/2. However, elsewhere in this report, she indicates that she does independently perform personal care tasks despite some difficulty. She indicates that she prepares her own meals, drives a car, goes shopping, and draws and does crafts. Ex. 14E. Moreover, other reports in the record suggest the claimant has been more functional than she reported in this function report (particularly the section in which she described a typical day). For example, during a consultative evaluation in October 2019, the claimant reported cooking/preparing food every day. She reported doing general cleaning twice a week and doing laundry twice a week. She reported going shopping 1-2 times a month. She reported being able to manage her own funds, drive, and take public transportation. She reported socializing with others. She reported being an artist and enjoying crafts. Ex. 4F/4. Notably, during a mental health visit in February 2023, the claimant reported that she had been accepted as a volunteer to Kentucky Play Think, which would allow her to attend festivals free of charge.

15

>She reported that she was hoping to earn money and sell her art as a vendor.

(27-28).

After considering these longitudinal treatment records and casting these records against Livelsberger's activities of daily living, the ALJ also found that a light work RFC without significant mental limitations was consistent with the broad medical opinion consensus which the ALJ found persuasive. (Tr. 28-31). Given this evidence the ALJ concluded that the outlier medical opinions were just that; unpersuasive outliers.

Having arrived at this RFC assessment, the ALJ found that Livelsberger could not perform any of her past work, but that, considering her age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform. (Tr. 32). Specifically, the ALJ noted three occupations identified by the vocational expert that Livelsberger was capable of performing: "office helper (DOT 239.567-010, light exertional level, SVP 2), with approximately 5,000 jobs in the national economy; photocopying machine operator (DOT 207.685-014, light exertional level, SVP 2), with approximately 5,000 jobs in the national economy; and mail clerk (DOT 209.687-026, light exertional level, SVP 2), with approximately 13,000 jobs in the national economy." (Tr. 33). Based upon these

16

findings, the ALJ determined that Livelsberger did not meet the stringent standard for disability set by the Act and denied her claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Livelsberger launces a multi-faceted attack upon this disability determination, contending that the ALJ erred in assessing the severity of her mental impairments, and in failing to address her use of a cane, her need to take naps or the severity of her symptoms. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we recommend the district court affirm the decision of the Commissioner.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.

17

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

> Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence.

Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based in part upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

20

United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In <u>Hess</u> the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the <u>Hess</u> decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form

of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.     Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process,

22

the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

23

opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other

24

evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. <u>See Titterington v. Barnhart,</u> 174 F. App'x 6, 11 (3d Cir. 2006); <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Metzger v. Berryhill,</u> No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

C. **Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence**

The plaintiff filed this disability application in November of 2021 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

## D.   Symptom Evaluation

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also illustrated by those cases which consider analysis of a claimant's reported pain. When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. *Adorno v. Shalala,* 40 F.3d 43, 48 (3d Cir.1994) (citing *Stewart v. Sec'y of Health, Education and Welfare,* 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015)(footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings, but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529,

31

416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. §404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's

32

evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes, but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706,

33

at *4 (M.D.Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

### E.   The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Livelsberger retained the residual functional capacity to perform light work with certain limitations. Therefore, we recommend the Court affirm this decision.

In reaching this conclusion, we note that the ALJ's decision largely comported with the opinions of the medical experts whose judgment the ALJ determined were

persuasive and drew substantial support from the clinical record as well as the plaintiff's self-reported activities of daily living. Nonetheless, Livelsberger challenges this decision on at least four separate grounds, none of which is ultimately persuasive.

### 1. The ALJ's Findings Regarding the Plaintiff's Mental Impairments Do Not Compel a Remand

At the outset, Livelsberger attacks the ALJ's determination that her mental impairments were not severe and assails the ALJ's decision to not include any material mental limitations in the RFC which was fashioned in this case. This argument fails on several scores.

First, substantial evidence supports the conclusion that Livelsberger did not suffer from severe emotional impairments. Rather, as the plaintiff candidly acknowledged, she only sought treatment of these conditions in order to bolster her disability application. Further, her treatment records, while sporadic and opportunistic, were also largely unremarkable. Finally, the sweeping medical opinion consensus supported the conclusion that these conditions were not severe, nor were they prolonged. Therefore, the ALJ did not err in finding these conditions to be non-severe at Step 2. See Gunn v. Kijakazi, 705 F. Supp. 3d 315, 327 (E.D. Pa. 2023) (sustaining Step 2 finding that mild mental impairments were non-severe).

Nor are we persuaded on these facts—where Livelsberger admitted that she sought treatment only to further a disability claim—that the ALJ needed to engage in a more detailed discussion of her mild impairments or further account for those mild conditions in fashioning an RFC. Instead, we agree with those: "cases which have held that isolated non-severe, mild emotional impairments do not have to be explicitly addressed by an ALJ when fashioning the residual functional capacity for a claimant." Sevilla v. Kijakazi, No. 1:22-CV-881, 2023 WL 4707387, at *12 (M.D. Pa. July 24, 2023) (citing Northrup v. Kijakazi, No. 20-cv-00412, 2022 WL 889968 (M.D. Pa. Mar. 24, 2022); Maddy v. Saul, No. CV 18-261, 2020 WL 516303, at *3 (W.D. Pa. Jan. 31, 2020); Redhead v. Berryhill, No. CV 17-639, 2018 WL 1911370, at *4 (W.D. Pa. Apr. 23, 2018); Shaffer v. Colvin, No. 13-925, 2014 WL 4925067, *5-6 (W.D. Pa. Sept. 30, 2014)).

Finally, even if we concluded that the ALJ erred in failing to address these mild conditions in a more fulsome fashion, any error would be harmless on the facts of this case. Social Security appeals are subject to harmless error analysis. Therefore:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: "'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" Moua v. Colvin, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, Seaman v. Soc.

36

Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017). In this case, several of the jobs that the ALJ found Livelsberger could perform entailed nothing more than "apply[ing] commonsense understanding to carry out detailed but uninvolved written or oral instructions." See e.g., 239.567-010 Office Helper, DICOT 239.567-010; 207.685-014 Photocopying-machine Operator, DICOT 207.685-014. Given the paucity of evidence that Livelsberger suffered from any severe mental impairment, and the rather modest mental requirements of these jobs which the ALJ found she could perform, any error in failing to discuss this mental RFC in more detail was harmless.

### 2. The ALJ Correctly Concluded that a Cane Was Not Medically Necessary

Livelsberger also contends that the ALJ erred by failing to incorporate her alleged use of a cane into her RFC. This argument warrants only brief consideration since the difficulty with this assertion is that there appears to have been no evidence presented by the plaintiff which established the medical necessity of a cane for

ambulation. This is a material shortcoming of proof on the plaintiff's part since "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing and describing the circumstances for which it is needed." Howze v. Barnhart, 53 Fed.Appx. 218, 222 (3d Cir. 2002) (quoting Social Security Ruling 96–9p) (internal quotations omitted). In short:

> Social Security regulations provide that an ALJ will not accommodate the use of a cane unless the claimant first provides "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed[.]" SSR 96–9p. Absent such documentation, an ALJ need not accommodate the use of a cane in a residual functional capacity assessment, even if the claimant was prescribed a cane by a doctor. See, Howze v. Barnhart, 53 Fed.Appx. 218, 222 (3d Cir. 2002).

Williams v. Colvin, No. 3:13-CV-2158, 2014 WL 4918469, at *10 (M.D. Pa. Sept. 30, 2014).

In the instant case, while Livelsberger alleges on occasion that she used a cane to ambulate, (tr. 128, 144, 340), there are also instances in which she and her mother denied that she needed a cane. (Tr, 327, 335, 445). Moreover, crucially, the record is devoid of any finding of medical necessity by a caregiver. Quite the contrary, several examining sources specifically found that a cane was not medically necessary. (Tr. 438, 442, 693). Since Livelsberger had not met the basic threshold showing of medical necessity for an assistive device, she cannot fault the ALJ for

neglecting to incorporate such a device into her RFC. This claim fails. See Phillips v. Colvin, No. 1:16-CV-1033, 2017 WL 3820973, at *9 (M.D. Pa. Aug. 16, 2017), report and recommendation adopted sub nom. Philips v. Colvin, No. 1:16-CV-1033, 2017 WL 3780138 (M.D. Pa. Aug. 31, 2017).

### 3. Livelsberger's Claims Regarding Rest Do Not Compel a Remand

Further, Livelsberger argues that the ALJ failed to account for her claimed need to nap during the day, but we discern no error here. Notably, no medical source opined that she suffered from this disabling degree of fatigue; the clinical record is devoid of evidence that Livelsberger suffered from a daily need for rest; and Livelsberger's activities of daily living were inconsistent with this claim of a chronic need to rest. In the absence of any substantial evidence documenting a need to rest each day, the ALJ did not err by failing to include these extreme limitations in the RFC in this case. Bowers v. Bisignano, No. 4:24-CV-2131, 2026 WL 560192, at *12 (M.D. Pa. Feb. 27, 2026).

### 4. Livelsberger's Remaining Symptom Evaluation Claims Fail

Finally, Livelsberger advances a series of alleged symptom evaluation errors in a summary fashion. (Doc. 13, at 19-22). However, at bottom these arguments simply invite us to re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)

("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). Since substantial evidence in the form of clinical proof, along with medical opinions, supported the ALJ's decision denying this claim for benefits we cannot supplant that decision based upon Livelsberger's speculative argument that the evidence could be construed in another way.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we recommend the Court find that substantial evidence supported the ALJ's evaluation of this case.

## IV.    <u>Recommendation</u>

For the foregoing reasons, IT IS RECOMMENDED that the decision of the

Commissioner in this case should be affirmed, and the plaintiff's appeal denied.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses, or recommit the matter to the magistrate judge with instructions.

Submitted this 12th  day of June 2026.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge
